[No. 29024-7-III.   Division Three.   June 28, 2011.]

LAMAR OUTDOOR ADVERTISING, *Appellant*, v. JOSEPH HARWOOD ET AL., *Respondents*.

*Patrick M. Risken* and *Sean P. Boutz* (of *Evans, Craven & Lackie PS*), for appellant.

*William R. Spurr* (of *Law Office of William R. Spurr*) and *Peter A. Witherspoon*, for respondents.

¶1 KORSMO, A.C.J. — Lamar Outdoor Advertising appeals the trial court's decisions (1) to vacate a default judgment it obtained and (2) summarily dismissing its case. We conclude that the trial court did not abuse its discretion in vacating the default judgment and correctly construed the rental contract at issue. The judgments are affirmed.

## FACTS

¶2 This case has its beginnings in a "ground lease" for the roof of a commercial building in downtown Spokane. The one page document was entered into on September 12, 1994, between Pridemark Outdoor Advertising and building owners Joseph and Kristi Harwood. It allowed Pridemark to place a billboard on the roof of the building. The lease agreement was a form used by Pridemark. The lease covered a 10-year period and would renew for another 10-year period unless terminated at the end of the period; the lease also could be terminated if the property were sold. Pridemark remained the owner of the billboard. The lease also bound successors to its terms.

¶3 Lamar succeeded Pridemark's interest in the lease. The initial 10-year period passed without either party terminating the lease, leading to a second like term. In the fall of 2005, Mr. Harwood and Cory Colvin formed Bell Franklin, LLC (Bell) as equal owners. Mr. Harwood served as the managing member. In January 2006, the Harwoods transferred their interest in the building to Bell. The ownership of Bell was changed to recognize that Joseph and Kristi Harwood owned 50 percent and Cory and Elisabeth Colvin also owned 50 percent.

¶4 Bell converted the building into seven condominium units in April 2007. They were designated as Units 001, 002, 101, 102, 200, 300, and 400. The roof was allocated to Unit 101. Shortly thereafter, Units 101 and 102 were sold to Winthrop and Allison Taylor; Bell retained the other five units. Spokane Housing Ventures Inc. signed a real estate purchase and sale agreement for the top three floors of the

building—Units 200, 300, and 400—on July 13, 2007. The sale was scheduled to close May 15, 2008. Spokane Housing advised Bell that the billboard would have to be removed from the roof once the sale closed.

¶5 In January 2008, Spokane Housing formed Bel Franklin Apartments LLC (Franklin).[1] A Lamar representative telephoned Spokane Housing several times at the beginning of 2008, asking if the billboard could remain on the roof. Spokane Housing advised Lamar that it would have to be removed. The sale of the top three floors to Franklin occurred July 7, 2008. The Harwoods also assigned their interests in the roof lease to Franklin at that time. Through the escrow company handling the sale, the Harwoods sent a notice of the sale and termination of the roof lease to Lamar, which received it July 14. In accordance with the terms of the lease, the letter directed Lamar to remove the sign within 90 days. Lamar notified Spokane Housing that because the Harwoods maintained an ownership interest in the property, the lease was still in effect. Lamar's counsel subsequently sent a letter expressing a similar opinion.

¶6 Franklin's architects and contractors indicated that the sign needed to be removed because of structural damage caused by the weight of the sign. The sign also needed to be removed to accommodate the renovation of the top three floors. If it was not removed by November 1, 2008, significant construction delays would result. Spokane Housing, acting as manager of Franklin, had the sign removed October 15, 2008. The sign had to be dismantled and removed from the roof at the cost of $13,854. Lamar subsequently retrieved some vinyl sign components but declined the remainder.

¶7 Lamar filed suit October 17, 2008 against the Harwoods, Bell, Franklin, Spokane Housing, and the Bel Condominium Owners Association. All defendants but the

---

[1] The roof was reallocated to Franklin as owner of Units 200, 300, and 400 via an amended declaration filed March 27, 2009.

Harwoods and Bell appeared. Bell and the Harwoods were served October 28, 2008. Lamar, on November 19, obtained an order of default and judgment against the Harwoods and Bell without giving notice to the other parties who had appeared in the case. The default judgment was in the sum of $528,568. Counsel for Bell and the Harwoods appeared December 3, 2008.

¶8 In mid-January 2009, counsel learned of the default judgment and moved to set it aside. After hearing argument, the trial court found excusable neglect and vacated the judgment against both parties.

¶9 All parties subsequently filed cross motions for summary judgment. At the initial hearing, the trial court dismissed Spokane Housing and the condominium association as defendants. The parties then prepared an undisputed statement of facts at the request of the trial court. After considering the arguments and the undisputed statement of facts, the court denied Lamar's motion for partial summary judgment and granted the motions of the remaining defendants for summary judgment.

¶10 Lamar then timely appealed to this court.

## ANALYSIS

¶11 This appeal challenges both the propriety of the decision to vacate the default judgment as well as the summary judgment rulings. Lamar also seeks attorney fees. We will address each argument in turn.

### Vacation of Default Judgment

¶12 The initial issue presented is whether the trial court erred in vacating the default judgments. Lamar erred in failing to give notice to the appearing defendants before it defaulted the nonappearing defendants. Additionally, there was no abuse of discretion in setting aside the default judgment.

■ ■ ¶13 The decision to vacate a default judgment is reviewed for abuse of discretion. *Griggs v. Averbeck Realty,*

*Inc.*, 92 Wn.2d 576, 582, 599 P.2d 1289 (1979). Discretion is abused when it is exercised on untenable grounds or for untenable reasons. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971). Refusal to vacate a default judgment is more likely to amount to an abuse of discretion because default judgments are generally disfavored. *White v. Holm*, 73 Wn.2d 348, 351-352, 438 P.2d 581 (1968).

¶14 Washington has a strong preference for giving parties their day in court; thus, default judgments are disfavored. *Morin v. Burris*, 160 Wn.2d 745, 754, 161 P.3d 956 (2007); *Griggs*, 92 Wn.2d at 581-582. While not a proceeding in equity, the decision to vacate a judgment should be made in accordance with equitable principles. *White*, 73 Wn.2d at 351.

¶15 There are four factors to consider when hearing a motion to vacate a default judgment:

> (1) That there is substantial evidence extant to support, at least prima facie, a defense to the claim asserted by the opposing party; (2) that the moving party's failure to timely appear in the action, and answer the opponent's claim, was occasioned by mistake, inadvertence, surprise or excusable neglect; (3) that the moving party acted with due diligence after notice of entry of the default judgment; and (4) that no substantial hardship will result to the opposing party.

*Id.* at 352. The first two factors are of primary importance. Where the defendant promptly moves to vacate and has a strong case for excusable neglect, the actual strength of the defense is less important to the reviewing court. *Id.* at 353. Moreover, a default judgment should be vacated if the plaintiff has acted in such a way that enforcing the judgment would be inequitable. *Morin*, 160 Wn.2d at 755. The overriding concern is to ensure that justice is done. *Griggs*, 92 Wn.2d at 582.

¶16 The trial court concluded that all four factors were satisfied. Clerk's Papers (CP) at 111-112. We agree. We also agree with respondents' argument that CR 55(a)(3) was violated. That rule provides:

(3) *Notice.* Any party who has appeared in the action for any purpose shall be served with a written notice of motion for default and the supporting affidavit at least 5 days before the hearing on the motion. Any party who has not appeared before the motion for default and supporting affidavit are filed is not entitled to a notice of the motion, except as provided in rule 55(f)(2)(A).

¶17 Lamar argues strenuously that it complied with the rules and that no irregularity exists. It argues that when subsection (3) is read in conjunction with subsection (1), no notice was required to any party. We disagree. CR 55(a)(1)[2] simply provides that when a party has not appeared, it may be defaulted. Nothing in that portion of the rule governs notice. That task is left to CR 55(a)(3), which could not be clearer. The first sentence provides that "[a]ny party who has appeared" "shall be served with a written notice of motion for default." The second sentence states that any party who has not appeared is not entitled to notice of the motion for default. Lamar's interpretation essentially reads the first sentence out of the rule, despite the command that an appearing defendant "shall" receive notice of a default. The only parties that can be defaulted are those who have not appeared. CR 55(a)(1). Franklin and its associated defendants were entitled to written notice of the default being sought against the Harwoods and Bell.

¶18 Lamar also contended at oral argument that it is not proper for one party to assert the rights of another, *i.e.*, the defaulting defendants could not claim a violation of the rights of Franklin and its associates. This argument has more force. Typically, one cannot assert the rights of another. *E.g.*, *Hallmann v. Sturm Ruger & Co.*, 31 Wn. App. 50, 52 n.1, 639 P.2d 805 (1982). However, our courts have increasingly recognized that in some instances a party can assert the rights of a nonparty. *See State v. Mendez*, 157 Wn.

---

[2] "*Motion.* When a party against whom a judgment for affirmative relief is sought has failed to appear, plead, or otherwise defend as provided by these rules and that fact is made to appear by motion and affidavit, a motion for default may be made."

App. 565, 577, 238 P.3d 517 (2010) (discussing cases permitting criminal defendant to assert rights of public at trial), *petition for review filed*, No. 85118-2 (Wash. Sept. 29, 2010). In particular, parties can assert the rights of another when those rights are intertwined with their own rights. *Hallmann*, 31 Wn. App. at 52 n.1; *Skilcraft Fiberglass, Inc. v. Boeing Co.*, 72 Wn. App. 40, 863 P.2d 573 (1993) (requiring notice to Boeing before default where a contractor working for Boeing had already appeared).

¶19 We think Lamar's argument goes to the discretion a trial judge should exercise in considering whether to set aside a default ruling. In some circumstances the violation may be too attenuated to justify that remedy. Here, however, it is very clear that the defendants all had the same defense interest and that the nondefaulted defendants had acquired their property interest from the defaulted defendants. The interests of the defendants were sufficiently entwined that the failure to give notice is an error that can be asserted by the defaulting defendants.

¶20 On these facts, we believe the failure to notify the appearing defendants was prejudicial error justifying the vacation of the default judgment. It would be inequitable to enforce the default judgment. *Morin*, 160 Wn.2d at 755.[3]

¶21 Alternatively, we do agree with the trial court that the four-factor test favored setting aside the default judgment. The first factor is whether the defendants had substantial evidence to establish *prima facie* the existence of a defense. In light of the ultimate conclusion of the case, it is clear that they did. The "ground lease" that was at the heart of the case also expressly provided for termination upon the sale of the property. Since Bell had transferred some of its interest in the property to Franklin, there was a *prima facie* defense established.

---

[3] This position is reinforced by the fact that notice of the default judgments was not given to the Harwoods and Bell even after counsel appeared for them in the action. Instead, Lamar let matters proceed for another six weeks before the default was discovered.

¶22 The second factor is whether there was an excuse for the failure to appear. The court found excusable neglect. The Harwoods and Bell had retained counsel and told him about the lawsuit, although not about being served. They also were aware that the codefendants had appeared in the action. Counsel for Bell and the Harwoods could wait a reasonable time to see if service on his clients was accomplished before appearing. Under the circumstances, the trial court had tenable grounds for its conclusion.

¶23 The third factor is whether the defaulting party acted with due diligence to set aside the default. These defendants did. The motion to vacate the judgment was heard within a few weeks of the discovery that it existed.

¶24 Finally, the last question is whether Lamar would suffer substantial hardship from vacating the default judgment. The record does not reflect any substantial hardship. Lamar was still able to pursue its case against the entire group of defendants.

¶25 The four-factor test strongly supports the trial court's ruling. It did not abuse its discretion when it vacated the default judgment.

### Summary Judgment

¶26 Lamar also argues that the trial court erred in denying its motion for partial summary judgment and in granting the defendants' competing motions for summary judgment. We will treat the two arguments as one.

¶27 The standards for reviewing a summary judgment are well recognized. Summary judgment is proper when, after viewing the evidence in a light most favorable to the opposing party, there are no issues of material fact and the moving party is entitled to judgment as a matter of law. *Trimble v. Wash. State Univ.*, 140 Wn.2d 88, 93, 993 P.2d 259 (2000). A trial court's ruling on a summary judgment motion is reviewed *de novo* since an appellate court sits in the same position as the trial court. *Hubbard v. Spokane County*, 146 Wn.2d 699, 706-707, 50 P.3d 602 (2002). All facts and

reasonable inferences are construed in the light most favorable to the nonmoving party. *Id.* at 707. Summary judgment should be granted if reasonable persons could reach but one conclusion based on all of the evidence. *Id.*

¶28 The facts are not in question in this appeal. The parties submitted an agreed upon statement of facts for the trial court's consideration. Thus, the sole issue is the meaning of the contract provision governing sale of the property. The existence of a contract and construction of any ambiguous terms is a legal question that is subject to *de novo* review. *Yeats v. Estate of Yeats*, 90 Wn.2d 201, 204, 580 P.2d 617 (1978); *Keystone Masonry, Inc. v. Garco Constr., Inc.*, 135 Wn. App. 927, 932, 147 P.3d 610 (2006); *Colby v. Yakima County*, 133 Wn. App. 386, 391, 136 P.3d 131 (2006). Language that is clear on its face does not need construction. *Cerrillo v. Esparza*, 158 Wn.2d 194, 201, 142 P.3d 155 (2006). Ambiguities are construed against the drafter of the contract. *Rouse v. Glascam Builders, Inc.*, 101 Wn.2d 127, 135, 677 P.2d 125 (1984).

¶29 The provision in question is found in paragraph 11 of the lease. It states:

> 11. Special conditions: (90) day cancellation notice required if property is sold and new owner desires sign removal. Mr. Harwood to furnish name and notify of pending sale.

CP at 67.

¶30 Lamar argues that because Bell retained two condominium units in the building, there had not been a sale of the property. In other words, Bell and the Harwoods had to divest themselves entirely of any interest in the building before the property was considered "sold." Not surprisingly, the defendants argue that the property had been sold and the lease was thereafter properly terminated. Lamar's motion for partial summary judgment argued that the destruction of its billboard constituted conversion since it had a lawful right to maintain the billboard on the roof. The defendants answered that since notice was given, the fail-

ure to retrieve the billboard constituted abandonment, which is a complete defense to the tort of conversion. *Jones v. Jacobson*, 45 Wn.2d 265, 267, 273 P.2d 979 (1954). In their own motions for summary judgment, the defendants contend that the property was sold and the lease was canceled. Thus, the competing motions for summary judgment all turn on the meaning of paragraph 11 of the lease.

¶31 The word "property" could be synonymous with the word "building," as Lamar argues. The word "property" also could refer to the subject matter of the "ground lease," *i.e.*, the roof where the sign was located. While we doubt that either party contemplated in 1994 that the building would be converted to condominiums, it is not an unreasonable interpretation of the word "property" under these facts to construe it to mean solely the roof of the building. Lamar never contended it had a right to use any other part of the building. However, its construction of the word "property" effectively left the roof owners without the ability to fix its portion of the building or otherwise use its property for its intended purposes.

¶32 While we think "property" can and should be narrowly read to refer to the roof, we need not rest our decision on that reading. At worst, both parties have a reasonable construction of the word and the lease is therefore ambiguous. Since Lamar's predecessor drafted the document, we will construe that ambiguity against Lamar. *Rouse*, 101 Wn.2d at 135. The "property" in paragraph 11 of the lease that was sold was the roof area of the building. Franklin was the true owner and properly gave notice through its manager, Spokane Housing, that the billboard needed to be removed in order to facilitate its remodeling. The lease was lawfully terminated in accordance with its terms.

¶33 The trial court correctly concluded that the lease had been properly terminated. It did not err in granting summary judgment to the defendants and denying Lamar's motion for partial summary judgment.

*Attorney Fees*

¶34 The contract does not provide for attorney fees. Lamar contends that it is entitled to attorney fees because it was unwillingly brought into this litigation. *See Aldrich & Hedman, Inc. v. Blakely*, 31 Wn. App. 16, 19, 639 P.2d 235, *review denied*, 97 Wn.2d 1007 (1982). The Harwoods ask for attorney fees for responding to frivolous litigation. RAP 18.9. We deny both requests.

¶35 *Aldrich* recognized that in some instances a third party dragged into litigation by other parties can equitably recover attorney fees as damages. 31 Wn. App. at 19-20. That is not the factual circumstance of this case. Lamar began this litigation to enforce what it perceived to be its rights under the lease. It was not a third party to this litigation, unwillingly brought in by one of the other parties. *Aldrich* is not a vehicle to obtain attorney fees where the contract itself does not provide for them. We deny Lamar's request for fees under this equitable doctrine.

¶36 We also deny the request by the Harwoods. This was not a frivolous appeal. Lamar presented debatable issues. Indeed, we concluded that the critical contract provision was ambiguous. While Lamar has lost this appeal, it was not engaged in frivolous litigation.

¶37 The judgments are affirmed.

BROWN and SIDDOWAY, JJ., concur.