# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In re the Marriage of: | No. 49663-1-II |
| ANDREW J. HELLMAN, | |
| Appellant, | |
| v. | |
| MIRANDA R. HELLMAN, | UNPUBLISHED OPINION |
| Respondent. | |

LEE, J. — Andrew Hellman (Hellman) appeals the superior court's dissolution decree, findings of fact and conclusions of law, and parenting plan (final orders) entered as a part of his dissolution from Miranda Hellman (Tucker). Hellman argues that the superior court (1) erred by entering the final orders because (a) the parties did not reach an agreement, and (b) the final orders included terms that were not agreed to or discussed by the parties; (2) abused its discretion by not holding a hearing on disputed evidentiary issues; and (3) violated the Code of Judicial Conduct by (a) coercing him into agreement, and (b) not affording him a right to be heard.

We hold that the superior court erred when it included terms in the final orders regarding the tax exemption, dispute resolution of parenting plan disputes, and the amount of child support.

Accordingly, we affirm in part, reverse in part, and remand for a proper determination of the tax exemption, dispute resolution of parenting plan disputes, and the amount of child support.

FACTS

Hellman and Tucker were married in 2012. The parties had a daughter together and Tucker also had a son from another relationship. The parties separated in 2014.

On March 29, 2016, Hellman filed a petition for legal separation. Tucker responded and asked for a dissolution of marriage. In his petition, Hellman asked that no spousal maintenance be ordered and Tucker agreed in her response.

At the time Hellman filed his petition, Tucker had a domestic violence protection order against Hellman that protected her and both of her children.[1]

On August 24, the superior court held a settlement conference with the parties, who were both self-represented. On the record, the superior court stated that it had spoken to the parties and believed that there was an agreement. The superior court then asked Tucker to go over the terms of the agreement.

Tucker began by reiterating her request for a dissolution and stated that she believed the marriage was irretrievably broken. Tucker also stated that she was to be awarded the family home. The home had an assessed value of $204,000. Although there was still money owing on the family home, the home had $35,000 in equity.

---

[1] The protection order was renewed on July 6, 2016 for another year.

Tucker further stated that each party would receive the vehicle they currently possessed and would be responsible for its payments. Tucker would also receive the motorcycle and would be responsible for the loan on it.

Tucker then outlined the parties' debts. Tucker stated that the parties agreed to split the community debt and the equity in the home. In exchange for being awarded the family home, Tucker agreed to be responsible for all of the community debt, except the debt on Hellman's vehicle, his life insurance policy,[2] and one of Hellman's credit cards.

For a parenting plan, Tucker stated that Hellman would have visitation with their daughter on alternate weekends[3] after he completed the domestic violence treatment he was currently in. There would be a phase-in period before going to complete alternate weekends because their daughter had yet to have an overnight with Hellman; the parties would start with a single whole day, then single day and night, and eventually full alternate weekends. Hellman would pick up their daughter at day care on his visitation days. Tucker agreed to modify the protection order to allow for the parenting plan. Because their daughter was not yet school age, the parties agreed to meet with a mediator to work out a school schedule before their daughter started school.

Although there was an administrative child support order in place, the parties agreed to have the superior court reset the child support. Tucker agreed to come back to court with her current pay stubs and proof of day care in order for the superior court to reset child support.

---

[2] Both parties had their own life insurance policies, had loans against them, and would be awarded their respective policies and be required to pay for the loans on them.

[3] "Weekends" for Hellman would be Tuesdays and Wednesdays due to his work schedule.

The superior court asked if there was anything else that was not covered, and Tucker said that was it. The superior court then asked Hellman if he agreed to what was discussed. Hellman sought confirmation that he would pick up his daughter at day care and that the protection order would be modified to allow that. After the superior court told him that Tucker had agreed to those terms, Hellman agreed with the terms outlined by Tucker. Hellman then mentioned some money that he had given to Tucker and the following exchange occurred:

> THE COURT: I have to tell you that we have spent an extra 15 minutes on this settlement conference. I have people waiting, including a call from Afghanistan for someone who wants to participate, and that was supposed to start 15 minutes ago.
> MR. HELLMAN: Okay.
> THE COURT: So my question to you is do you agree with this?
> MR. HELLMAN: Not right out, Your Honor.
> THE COURT: All right. This settlement conference is over. There's no agreement today. I thought that you had told me you were in agreement with this. That's why I'm surprised.
> MR. HELLMAN: Your Honor, I just—I do want to confirm a couple things. The bank account for the truck I can't pay.
> THE COURT: Why?
> MR. HELLMAN: Because I don't know the account number.
> THE COURT: All right. She will give it to you. She's gonna—she's gonna prepare a decree of dissolution which will list all of the debts, and presumably it will show the debt that you need to pay.
> MR. HELLMAN: For half the equity in the house.
> THE COURT: Correct. She's just presented evidence of debt at the time of separation that was greater than $17,500, which is your share of the equity.
> MR. HELLMAN: Is there any evidence to be presented?
> THE COURT: Do you want her to provide copies?
> MR. HELLMAN: I would, Your Honor.
> THE COURT: All right. Can you provide copies?
> MS. HELLMAN: Yes, yes, I can.
> MR. HELLMAN: Then I am in agreement.
> THE COURT: All right. I will adopt the agreement.

Clerk's Papers (CP) at 28-30. Hellman did not raise any other issues. A hearing for presentation of final orders was set for September 2.

On September 2, Hellman appeared with counsel. Hellman claimed that there was no agreement. The superior court ordered the transcripts from the settlement conference. After reviewing the transcripts, the superior court determined there was an agreement. The superior court then set another hearing for October 14 for the parties to present final orders.

Before that hearing, Hellman filed a memorandum requesting that the October 14 hearing be stricken and a trial be set. Hellman argued that Tucker had failed to provide a complete statement of her income information, the cost of day care, and the debt on the marital credit cards as of the date of separation; the value of the home and whether Hellman's name would remain on the mortgage was still at issue; the parties did not discuss the allocation of retirement funds and assets purchased with the marital credit cards; and the settlement conference transcript did not set out the essential terms necessary to draft a parenting plan, including a school schedule and details regarding the gradation period for visitation. Hellman admitted that Tucker provided him with pay stubs, an excel spreadsheet of Military Leave and Earning Statement income, and bank statements for three credit cards.

On October 14, the superior court held a hearing for presentation of final orders. Tucker presented a proposed final dissolution decree, findings of fact and conclusions of law, and parenting plan. Hellman argued that Tucker's documents were incomplete and noted that he had filed objections. The superior court acknowledged Hellman's objections but said there was a sufficient record for the court to enter final orders. The superior court then said that Hellman could send the court a letter with his concerns. Before signing the final orders, the superior court would look over Hellman's concerns and correct Tucker's proposed final orders if they were not consistent with the record.

Hellman filed a letter noting his objections. Hellman noted that no inquiry was made into several terms included in the proposed final orders. These terms included: requiring Hellman to sign a quit claim deed and real estate tax affidavit to Tucker by November 15, 2016; awarding each party the personal property in their respective possession, including household furniture, and their respective bank and retirement accounts; requiring the responsible party to hold the nonresponsible party harmless for any resulting debt collection incurred by the nonresponsible party for debt the responsible party was ordered to pay; requiring the parties to be responsible for their own costs and fees; allowing a parent to later request post-secondary support; awarding Tucker the tax exemption; and stating that there was no spousal maintenance or separation contract. Hellman stated that no clear agreement was made to divide assets and debts, no inquiry was made into the equity and debt of their vehicles and life insurance policies, the superior court applied the wrong standard in evaluating the debt and equity, and he did not receive any documentation from Tucker verifying the amount of debts.

Hellman also noted that the property awarded and debt assigned to Tucker did not include the motorcycle, the debt for the motorcycle, a community credit card, and her life insurance loan. Further, the debt listed for Hellman did not include his life insurance loan and it was unclear what the debt was for that was assigned to him. Also, the exact amount of debt for each credit card differed from the amount stated at the conference. Hellman then pointed out that the parties had agreed to have the superior court reset child support.

In regard to the parenting plan, Hellman noted additional terms that were not discussed at the settlement conference hearing but included in the proposed final parenting plan. These terms included: maintaining the agreed upon visitation schedule, and later school schedule, to continue

during the summer and holidays, and for Hellman's visitation to start in the morning time; limiting Hellman's parental decision-making and the reasons for such limitations; requiring Hellman to complete an evaluation and treatment; requiring the parties to resolve disputes through mediation; and requiring a three-month phase-in period before full alternate weekend visitation. Hellman also noted that the section on conflicts in the holiday schedule was not filled out. Hellman later filed a supplemental memorandum noting that he petitioned for legal separation and not a dissolution of marriage.

A week later, the superior court entered a final dissolution decree, findings of fact and conclusions of law, and parenting plan. Hellman appeals the superior court's final orders.

ANALYSIS

A.    SETTLEMENT AGREEMENT

Hellman argues that the superior court erred when it entered the final orders because the parties did not reach an agreement and the superior court included terms that were not agreed to or discussed. We agree in part.

1.    Existence of an Agreement

Hellman argues that the superior court erred when it found that the parties reached an agreement. We disagree.

a.    Standard of review

As an initial matter, Hellman argues that the standard of review on a superior court's decision regarding the enforcement of a settlement agreement is de novo, citing *Condon v. Condon*, 177 Wn.2d 150, 162, 298 P.3d 86 (2013). However, Hellman is not challenging the *enforcement* of a settlement agreement; rather, Hellman is challenging the *existence* of an agreement.

Therefore, although we apply the de novo standard of review, it is based on the principle that the existence of an agreement is a legal question that is reviewed de novo. *Lamar Outdoor Advert. v. Harwood*, 162 Wn. App. 385, 395, 254 P.3d 208 (2011).

              b.        Agreement between the parties

Settlement agreements are governed by general principles of contract law. *In re Marriage of Ferree*, 71 Wn. App. 35, 39, 856 P.2d 706 (1993). Washington follows the objective manifestation theory. *Condon*, 177 Wn.2d at 162. Under this theory, we determine the intent of the parties based on the objective manifestations of the agreement rather than the parties' subjective intent. *Id*. "[M]utual assent is an essential element for the formation, or existence, of a valid agreement." *Cruz v. Chavez*, 186 Wn. App. 913, 915, 347 P.3d 912 (2015).

Here, the settlement conference transcript shows that the parties mutually assented to the settlement. At the settlement conference, Tucker requested a dissolution of marriage because the marriage was irretrievably broken. Tucker then discussed receiving the family home, what the value of the home was, and each parties' share of equity in the home; awarding the vehicles and requiring each party to pay for the vehicle they each possessed; awarding the motorcycle to Tucker and requiring her to pay for the amounts owing on the motorcycle; requiring Tucker to pay most of the community debt; requiring Hellman to pay for his own credit card debt on a single credit card; and awarding their life insurance policies to the respective party and requiring each party to pay for the outstanding loans on their own life insurance policies. Tucker also discussed requiring Hellman to complete his domestic violence treatment prior to starting visitation with their daughter, which included using a phase-in period before fully implementing the visitation plan; having the visitation exchange take place at day care; requiring the parties to attend mediation

before their daughter started school to set a school schedule; modifying the protection order to allow for the parenting plan; and having the superior court set child support.

The superior court then asked Hellman if he was in agreement with everything that Tucker had discussed. Hellman responded that he had some questions and was not in agreement out right. After the superior court answered Hellman's questions and Tucker agreed to provide documents evidencing the community debt, Hellman agreed to everything Tucker had discussed.

This record demonstrates mutual assent by the parties to an agreement. *Id*. Therefore, we hold that the superior court did not err when it entered final orders because the parties had reached an agreement.

Hellman also argues that the parties did not agree on the value of the family home or the debt owing on the home. However, this claim is factually meritless. Tucker stated on the record that the home had an assessed value of $204,000 and that there was $169,000 owing. Thus, Hellman's agreement at the end of the settlement conference to the terms discussed by Tucker included the value of and debt owing on the home.

2.      Inclusion of Additional Terms

Hellman argues that the superior court erred when it entered the final orders because the court included terms that were not agreed to or discussed. We agree in part.

a.      Standard of review

We review de novo whether a superior court erred by imposing terms in a settlement agreement that were not agreed upon. *See Condon*, 177 Wn.2d at 162. Furthermore, interpretation of the terms of an agreement is a question of law that is reviewed de novo. *Major Prods. Co. v.*

*Nw. Harvest Prods., Inc.*, 96 Wn. App. 405, 411, 979 P.2d 905, *review denied*, 139 Wn.2d 1007 (1999).

        b.      Additional terms

Hellman challenges the inclusion of terms within the final orders that were not agreed to or discussed at the settlement conference. Such terms include: (1) requiring Hellman to sign a quit claim deed and real estate tax affidavit to Tucker by November 15, 2016; (2) awarding each party the personal property in their respective possession, and their respective bank and retirement accounts; (3) requiring the responsible party to hold the non-responsible party harmless for any resulting debt collection incurred by the non-responsible party for debt the responsible party was ordered to pay; (4) requiring the parties to be responsible for their own costs and fees; (5) awarding Tucker the tax exemption; (6) limiting Hellman's parental decision-making and the reasons for such limitations; (7) maintaining the agreed upon visitation schedule, and later school schedule, to continue during the summer and holidays, and for Hellman's visitation to start in the morning time; (8) requiring the parties to resolve disputes through mediation; (9) requiring a three-month phase-in period before full alternate weekend visitation; (10) maintaining the administratively set child support; (11) allowing a parent to later request post-secondary support; (12) stating there was no spousal maintenance; (13) requiring Hellman to complete an evaluation and treatment; (14) requiring Hellman to pay the single debt; and (15) stating there was no separation contract.

Courts will not impose obligations that the parties did not assume for themselves. *Condon*, 177 Wn.2d at 163. Courts also will not imply obligations into an agreement absent legal necessity. *Id*. But courts may strain an agreement when the parties' language and conduct evidences an intent to contract and there are reasonable means to provide an appropriate remedy. *Kloss v. Honeywell,*

*Inc.*, 77 Wn. App. 294, 299, 890 P.2d 480 (1995). The goal of construing a contract is to effectuate the parties' mutual intent. *In re Estate of Catto*, 88 Wn. App. 522, 528, 944 P.2d 1052 (1997), *review denied*, 134 Wn.2d 1017 (1998). Mutual intent can be established by inference but must be based on an objective manifestation. *Id*. And courts "impute to a person an intention corresponding to the reasonable meaning of his words and acts." *Dwelley v. Chesterfield*, 88 Wn.2d 331, 335, 560 P.2d 353 (1977).

      i.   Terms implied or statutorily required

  Here, the parties' participation in the settlement conference and the parties' statements on the record regarding their agreement evidenced an intent to contract. And many of the specific terms that Hellman challenges can be implied from the terms that were discussed on the record and the objective conduct of the parties.

  First, requiring Hellman to sign a quit claim deed and real estate tax affidavit to Tucker by November 15, 2016 can be implied from the parties' discussions on awarding the family home to Tucker. Once the final orders were entered, the division of property agreed upon would take effect. And the parties agreed to award the home to Tucker. Thus, requiring Hellman to sign a quit claim deed and real estate tax affidavit to Tucker by a certain date could be implied from the terms discussed and agreed to by the parties. *Condon*, 177 Wn.2d at 163; *Kloss*, 77 Wn. App. at 299; *Dwelley*, 88 Wn.2d at 335.

  Second, awarding each party the personal property in their possession and their individual bank and retirement accounts can be implied from the parties' discussions on the division of their vehicles. The parties agreed that they would each retain the vehicle in their possession. The parties also agreed that there was nothing that the superior court did not cover. From the parties' retention

of the vehicles in their respective possession and agreement that nothing else was left to be discussed, the superior court could imply that the parties agreed to retain the personal property in their possession.[4]  *Kloss*, 77 Wn. App. at 299; *Dwelley*, 88 Wn.2d at 335.

Third, requiring the responsible party to hold the non-responsible party harmless for any resulting debt collection incurred by the non-responsible party can be implied from the parties' discussion on the division of debt.  From the parties' agreement that each party would be responsible for the debt discussed, the superior court could imply that the responsible party would hold the non-responsible party harmless for any resulting debt collection incurred by the non-responsible party on debt the responsible party was ordered to pay.  *Kloss*, 77 Wn. App. at 299; *Dwelley*, 88 Wn.2d at 335.

Fourth, requiring the parties to be responsible for their own fees and costs can be implied from the absence of any request of such fees and costs by the parties.  The parties did not make any such request at any time during the proceedings.  From the objective conduct of the parties, the superior court could imply that each party would be responsible for their own fees and costs. *Catto*, 88 Wn. App. at 528; *Dwelley*, 88 Wn.2d at 335.

Fifth, limiting Hellman's parental decision-making authority was required by statute. Under RCW 26.09.191(1), a permanent parenting plan cannot include mutual decision-making if a parent had engaged in "physical, sexual, or a pattern of emotional abuse of a child" or "a history of acts of domestic violence."  Because of the domestic violence protection order against Hellman

---

[4] The superior court could also imply from the agreement to retain the vehicle in their respective possession and to award the home to Tucker that Tucker would be awarded the household furniture.  And under RCW 26.09.050(1), the court was required to provide for the disposition of property.  The superior court did so here with its division of property.

protecting Tucker and her children, the superior court could limit Hellman's decision-making authority.

Sixth, requiring the agreed upon visitation schedule, and later school schedule, to continue during the summer and holidays, and for the schedule to start in the morning time, can be implied from the parties' discussion on the visitation schedule. The parties agreed that Hellman would only have time with their daughter on alternate weekends. The parties also agreed that Hellman's visitation time would begin with a single whole day. No further terms were discussed and the parties agreed that nothing more needed to be covered. From this discussion, the superior court could imply that the agreed upon visitation schedule would continue during the summer and holidays and that Hellman's visitation would start in the morning. *Kloss*, 77 Wn. App. at 299; *Dwelley*, 88 Wn.2d at 335.

Seventh, requiring a three-month phase-in period before implementing the full visitation schedule can be implied from the parties' discussion that the schedule would not take effect immediately. The parties agreed to implement a phase-in period before Hellman would have full alternate weekend visitation because their daughter had yet to have an overnight with Hellman. The phase-in period would start with a single whole day, then a single day and night, and eventually full alternate weekends. From this agreement, and the slow phase-in period discussed, the superior court could imply that the phase-in period would require three months. *Kloss*, 77 Wn. App. at 299.

Finally, with regard to allowing a parent to request post-secondary support at a later date, the superior court did not actually impose a term of post-secondary support but merely reserved the issue to allow a parent to ask for such support at a later date. And in regard to not requiring spousal maintenance and requiring Hellman to complete domestic violence treatment, the parties agreed to such terms within their pleadings and at the settlement conference. Also, awarding Hellman the single debt was agreed to by the parties. Hellman expressly agreed that Tucker was to be responsible for all of the debt except for the amounts owing on one of Hellman's credit cards, Hellman's vehicle, and Hellman's life insurance policy. And the parties did not inform the court of the existence of any separation agreement and Hellman does not assert that such an agreement exists.

Thus, the trial court could impose the additional terms discussed above. Therefore, we hold that Hellman's challenge to these terms fails.

ii.     Terms not implied

Although the superior court could imply many of the terms that were included in the final orders even though they were not expressly discussed at the settlement conference, several of the terms could not be implied. The record and the objective conduct of the parties do not support an implication of the following terms.

First, awarding the tax exemption to Tucker cannot be implied. The parties agreed that Hellman would only have visitation with their daughter on alternate weekends and that the child would reside with Tucker the remainder of the time. Under the federal tax code, the custodial parent is typically entitled to the dependency exemption. *In re Marriage of Peacock*,

54 Wn. App. 12, 14, 771 P.2d 767 (1989).  However, the statute does not mandate awarding the tax exemption to the custodial parent and the parties did not discuss the tax exemption at all during the settlement conference.  As a result, awarding the tax exemption to Tucker could not be implied.

Second, requiring the parties to resolve disputes regarding the parenting plan through mediation was precluded by statute.  Under RCW 26.09.187(1), "The court shall not order a dispute resolution process, except court action, when it finds that any limiting factor under RCW 26.09.191 applies."[5]  As discussed above, the superior court limited Hellman's parental decision-making authority pursuant to RCW 26.09.191(1) because Tucker had a domestic violence protection order against Hellman.  Consequently, the superior court could not order the parties to resolve parenting plan disputes through mediation.

Third, maintaining the administratively set child support cannot be implied.  Under RCW 26.09.050(1) and RCW 26.09.100(1), in a dissolution or legal separation proceeding, the court is required to order child support for any dependent child of the marriage.  At the settlement conference, the parties agreed that an administrative order of child support was in place and that

---

[5] Under RCW 26.09.191(1), such limiting factors include, "(a) Willful abandonment that continues for an extended period of time or substantial refusal to perform parenting functions; (b) physical, sexual, or a pattern of emotional abuse of a child; or (c) a history of acts of domestic violence as defined in RCW 26.50.010(3) or an assault or sexual assault that causes grievous bodily harm or the fear of such harm."

the superior court would reset the amount of child support based on Tucker's current pay stubs and cost of day care. While the parties did not agree to invalidate the administrative order of child support and neither party provided the court with the financial documentation needed to calculate child support, the parties agreed to have the superior court reset the amount of child support. As a result, the superior court could not imply that the parties intended for the administrative order of child support to remain in effect.

Because these terms cannot be implied from the parties' agreement at the settlement conference or their objective conduct, we reverse the final orders with regard to these terms and remand for the superior court to make a proper determination of such terms.

3.    Conversion to Dissolution[6]

Hellman argues that the superior court erred when it entered a final dissolution decree because he petitioned for legal separation. We disagree.

When the parties agree to a dissolution of marriage or legal separation, the court may enforce the agreement irrespective of the type of relief requested in the original pleadings. *See Ferree*, 71 Wn. App. at 47. Although Hellman petitioned for a legal separation here, Tucker requested a dissolution of marriage in her response to Hellman's petition and during the settlement conference. Hellman agreed to the terms of the agreement discussed by Tucker, which included the request for a dissolution of marriage. Moreover, Hellman does not want the dissolution decree

---

[6] Hellman also argues that the superior court abused its discretion when it did not hold an evidentiary hearing. However, a superior court abuses its discretion only if it enforces a settlement agreement without holding an evidentiary hearing when there are genuine issues of material fact as to the existence or material terms of an agreement. *See Brinkeroff v. Campbell*, 99 Wn. App. 692, 697, 994 P.2d 911 (2000). But this case involves a challenge to the existence of a settlement agreement, not the enforcement of a settlement agreement. Thus, this claim fails.

to be undone. He expressly stated that "I would not want the marriage reinstated." Oral Argument at 24:59. Wash. Court of Appeals oral argument, *In re Marriage of Hellman*, No. 49663-1-II (Jan. 11, 2018), at 24 min., 58 sec. to 25 min., 1 sec. (on file with court). Because Hellman agreed to a divorce and does not want the marriage reinstated, this argument fails.

B.      CODE OF JUDICIAL CONDUCT

Hellman argues that the superior court violated the Code of Judicial Conduct (CJC) 2.6. We disagree.[7]

Under CJC 2.6(B), a judge may "encourage parties to a proceeding and their lawyers to settle matters in dispute but should not act in a manner that coerces any party into settlement." Also, a judge shall provide each party "the right to be heard according to law." CJC 2.6(A). "A judge is presumed to perform his functions regularly and properly, without bias or prejudice." *In re Estate of Haye*s, 185 Wn. App. 567, 607, 342 P.3d 1161 (2015). A party asserting a CJC violation must present sufficient evidence demonstrating such a violation. *See id*.

First, Hellman fails to show that the superior court coerced him into agreement. A judge "should not act in a manner that coerces any party into settlement." CJC 2.6(B). But the record does not show any coercion. After Tucker made a record of the parties' agreement, the superior court asked Hellman if he agreed with Tucker. Hellman asked for confirmation that the protection order would be modified to allow him to pick up his daughter at day care. The superior court

---

[7] Tucker argues that we should decline to address this claim because it was not raised below. However, we exercise our discretion to address the merits of this challenge. RAP 2.5(a).

reminded Hellman that Tucker had agreed to modify the protection order. Hellman also had issues with the amount of community debt. Tucker agreed to provide Hellman with documentation showing their community debt. Hellman then agreed to all of the terms discussed by Tucker. While the superior court also interjected that they had spent an extra 15 minutes in the settlement conference, the court never forced the parties to agree. In fact, the superior court even declared there was no agreement at one point. In response, Hellman stated that he just wanted to clarify some issues. Once those issues were clarified, Hellman agreed on his own accord. Therefore, we hold that Hellman's claim of improper judicial coercion fails.

Second, Hellman fails to show that the superior court did not afford him a chance to be heard. A judge shall provide each party "the right to be heard according to law." CJC 2.6(A). The record here shows that such a right was provided. Hellman was given the opportunity to speak and ask questions at the settlement conference, he submitted multiple memoranda with requests and objections, and the superior court said that it would consider such memoranda before signing the final orders. While Hellman claims that the superior court ignored such memoranda, Hellman does not show that this was in fact the case. Therefore, we hold that Hellman's claim that the judge denied his right to be heard also fails.

CONCLUSION

We affirm the superior court's final orders, except with regard to awarding Tucker the tax exemption, requiring mediation for parenting plan disputes, and maintaining the administrative child support order. Therefore, we affirm in apart, reverse in part, and remand to the superior court

18

for a determination of the tax exemption, method for resolving future parenting plan disputes, and setting the amount of child support.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Worswick, P.J.

Melnick, J.